In the Matter of RICHARD A. HARROW, Petitioner, v DAVID AXELROD, as Commissioner of the Department of Health of the State of New York, et al., Respondents.

Third Department, February 23, 1989

APPEARANCES OF COUNSEL

*Fried, Spector, Scher & Feldman (Jerome T. Levy, Irwin R. Karassik* and *Susan V. Kayser* of counsel), for petitioner.

*Robert Abrams, Attorney-General (Clifford A. Royael* and *Peter H. Schiff* of counsel), for respondents.

OPINION OF THE COURT

LEVINE, J.

Petitioner was licensed as a nursing home administrator in 1973 by respondent Board of Examiners of Nursing Home Administrators (hereinafter the Board). He was the administrator of the Beth Rifka Nursing Home (hereinafter Beth Rifka), located on Staten Island, from July 10, 1981 to August 26, 1982. Beth Rifka was built as a 240-bed facility. When petitioner assumed the position of administrator the utilization of 40 beds had been approved by the State Department of Health (hereinafter the Department), and an additional 80 beds were approved by November 1981. In March 1982, a visit by Department representatives was conducted in response to Beth Rifka's request for the approval of an additional 40 beds. That visit revealed serious deficiencies in the quality of services and administration of the facility and the Department decided to do a full survey, which was conducted over the third week of April 1982. An exit interview took place during the first week of May at which petitioner was verbally informed of the problems at Beth Rifka, followed by a 94-page statement of deficiencies indicating violations of Federal and State regulations in eight major categories, including, *inter alia,* services of the medical director, dietary, nursing, pharmaceutical services and medical record-keeping. Petitioner submitted a plan of correction in mid-June 1982. An interim visit by Department representatives, requested by petitioner, took place on June 24, 1982, but was discontinued because of a lack of progress in correcting the shortcomings noted in the April survey. The facility was resurveyed in July. This revealed virtually all of the same code violations, with the

addition of deficiencies noted in physicians' services. Of the eight categories of unacceptable conditions, seven directly affected patient health and security. The Department continued to closely scrutinize the operation of Beth Rifka, leading to a temporary suspension of the facility's operating certificate in late August 1982 and, after a hearing, revocation of its license, confirmed on review by this court *(Matter of Beth Rifka, Inc. v Axelrod,* 91 AD2d 1143, *lv denied* 58 NY2d 607).

In February 1983, petitioner was served with an administrative disciplinary petition containing 20 separate charges stemming from his tenure as administrator of Beth Rifka. The petition cited to Public Health Law § 2897 (1) (f), under which a nursing home administrator is subject to license revocation, a suspension or other penalties for "unethical conduct as defined by rules adopted by the board and certified by the [State Commissioner of Health]". Each charge specifically alluded to two of the regulatory definitions of unethical conduct, namely, "violation of any of the provisions of law or codes, rules or regulations of the * * * agency of the State having jurisdiction of the operation * * * of nursing homes" (10 NYCRR 96.1 [m] [2]) and "failure to exercise true regard for the safety, health and life of patients" (10 NYCRR 96.1 [m] [14]). Most of the charges referred to specific violations of the State nursing home regulations for the operation of such facilities, as to organization, administration and patient services (10 NYCRR parts 415-416).

At the administrative hearing that followed, the Department introduced the transcript of testimony, exhibits, findings and order from the Beth Rifka revocation hearing under a stipulation that the witnesses in that prior proceeding would be produced for cross-examination by petitioner.* The Department elicited direct testimony from various staff members who were involved in the several surveys conducted at Beth Rifka during the pertinent period. Petitioner's defense consisted of cross-examination of the Department's witnesses and the testimony of petitioner in his own behalf.

At the conclusion of the hearings, the Administrative Law Judge (hereinafter ALJ) exonerated petitioner, ruling that he could not be held responsible for the violations at Beth Rifka of code and regulation provisions concerning mandates appli-

---

* One of the Department's witnesses in the Beth Rifka proceeding had retired before the hearings herein commenced. The charges relating to that witness's prior testimony were withdrawn.

cable to nursing home *operators,* in contrast to those provisions expressly applicable to administrators. The ALJ found that petitioner did not fail to exercise true regard for patients, in that he made reasonable efforts to rectify the unsatisfactory conditions at the facility, under the deteriorating circumstances at Beth Rifka described in petitioner's testimony. The Board rejected the ALJ's findings and conclusions. It found that petitioner "failed miserably to meet his code-mandated duties to make operating decisions and supervise staff" (citing 10 NYCRR 96.1 [m] [2]), and "abdicated duties imposed upon him by his status as a licensed individual". The Board sustained the charges and revoked petitioner's license. This CPLR article 78 proceeding seeking to challenge that determination ensued.

■ The Board's determination should be confirmed. Initially, we reject petitioner's basic contention that he may not be disciplined for nursing home deficiencies in services to patients other than those specifically defined under the regulations as duties of a nursing home administrator. In *Matter of Lewis v Board of Examiners* (97 AD2d 671, *lv denied* 61 NY2d 604), we upheld suspension of an administrator's license on the basis of deficiencies in dietary and housekeeping practices at a nursing home, although such services were not code-mandated responsibilities of a nursing home administrator. In *Lewis,* we held that improper nutritional and food storage practices, similar to those established here, supported the Board's finding of an administrator's failure to exercise true regard for patients' safety, health and life (10 NYCRR 96.1 [m] [14]).

The Board could also impose liability on the basis of the grave violations at Beth Rifka of code and regulation provisions for governance and patient services in the operation of nursing home facilities, under the facts established here. Petitioner admitted that, even before the disclosures of the Department's April 1982 survey, he had serious doubts regarding the ability of Beth Rifka's medical director to monitor and supervise the medical staff through audit of patients' records. Then, in early May 1982, he received oral notification of the results of the April survey which, as previously described, revealed serious violations at the facility in eight major categories. Among the specific substandard conditions noted, the report of the April survey addressed the failure of the medical director to review the work of staff physicians and check on the accuracy and completeness of patient records; excessive

use of patient restraints; poor nursing supervision; inadequate measures to prevent development of patient decubitus ulcers (bed sores); many instances where patients were not receiving prescribed medication or diet; the absence of an adequate program of exercise to prevent patients from incurring contractures; the failure to monitor severe weight changes in some 80 patients; inappropriate admissions of patients; inadequate security for and storage of patients' medications; and poor sanitation in the facility's kitchen.

The copiously detailed recitals of the foregoing and other deficiencies found in the April 1982 Department survey stood as a serious indictment of the competency of the major Beth Rifka department heads and staff serving under petitioner as administrator. Also implicated from the findings were serious risks to patients' lives, health and bodily functioning. Petitioner conceded that he drew these implications from the April survey report. The succeeding surveys and visitations in June, July and August 1982 by the Department established that the vast majority of the same patient life- and health-threatening deficiencies continued to exist. Contrary to petitioner's contentions, he could be held responsible for the regulatory violations that these deficiencies represented if he failed to exercise professional competence in (1) personally monitoring, or availing himself of the means to monitor the conditions at Beth Rifka and the performance of department heads and staff, and/or (2) taking appropriate steps to rectify the unacceptable conditions he was or should have been aware of. Such responsibility is implicit in the regulation provisions, directly applicable to nursing home administrators, defining their duties as "including but not limited to making operating decisions, providing general supervision, employing and discharging staff" (10 NYCRR 96.1 [j]; *see also,* 10 NYCRR 415.2 [c] [2]).

■ Contrary to petitioner's argument that the statutory disciplinary standard of "unethical conduct" (Public Health Law § 2897 [1] [f]) limits the disciplining of nursing home administrators to immoral or willful misconduct, the Board could properly define unethical conduct to include incompetence on the part of an administrator in permitting a facility to be in violation of administrative regulations governing the operation of nursing homes and in failing to exercise true regard for the safety, health and life of patients. By common definition, unethical conduct may consist of "not conforming to * * * professionally endorsed principles and practices"

(Webster's Third New International Dictionary 2494 [unabridged 1981]). The purpose of enacting a regulatory scheme for nursing home administrators under Public Health Law article 28-D was to assure "that the administration of nursing homes is in the hands of qualified individuals" (Governor's mem, 1970 NY Legis Ann, at 501; *see also,* Executive Dept mem, 1970 McKinney's Session Laws of NY, at 2962-2963). Moreover, we have previously recognized that a nursing home administrator's license revocation "falls closer into the category of a disciplinary sanction turning on the *fitness* of that particular person to practice under the license" *(Matter of Greco v Board of Examiners,* 91 AD2d 1108, 1109, *affd* 60 NY2d 709 [emphasis supplied]). Competence, as an ethical standard, is also recognized as to other professions *(see,* Code of Professional Responsibility, Canon 6, EC 6-1). The construction of the statutory phrase "unethical conduct" by the Board, the agency given the responsibility to regulate nursing home administrators, was thus not irrational and should be upheld *(see, Matter of John P. v Whalen,* 54 NY2d 89, 95-96).

■ There was substantial evidence to support the Board's finding that petitioner was subject to discipline under the foregoing standards in failing properly to administer Beth Rifka, to the detriment of the health and lives of the patients of that facility. The Board could rationally conclude that, despite full awareness of the inadequacies of his major department heads following the April 1982 survey, petitioner continued to rely primarily on their reports on the conditions at Beth Rifka, with naive faith that his subordinates would follow his directions to take corrective action. From our review of the evidence, many of the deleterious conditions and effects on patients of inadequate and improper practices were readily observable without a professional degree in a health care speciality such as medicine or nursing. Moreover, to the extent that a continuing evaluation of staff performance was beyond petitioner's expertise, his efforts to obtain consultants to perform a monitoring function, the pressing need for which was obvious, were weak and unimpressive. It was also clearly unethical for petitioner to accept and retain patients who were under physician's orders for physical therapy, during the almost two months when he well knew that the facility had no physical therapy capability.

■ The Board could likewise discount petitioner's attempt to attribute his failure to supervise staff and enforce proper standards on the basis of the officious meddling of Beth Rifka's executive director, who was neither licensed nor

trained as a nursing home administrator. If, as petitioner argued, that individual's interference was so important in explaining the deteriorating circumstances at Beth Rifka, the Board properly found that petitioner displayed excessive timidity and indecisiveness in confronting the problem. In short, the Board rationally applied the statutory and regulatory standards to discipline petitioner, and its findings were supported by substantial evidence. Given the serious conditions of Beth Rifka which petitioner's poor administration contributed to, and the well-documented disastrous effects on numerous patients, we do not find the penalty of revocation of license, with the statutory right to apply for restoration thereof after two years (Public Health Law § 2897-a [5]), so disproportionate as to require annulment.

■ Nor is annulment of the determination required because the Board considered the testimony of Thomas Tollerton, a member of the Department's survey team, who became hospitalized and later died before full cross-examination by petitioner. Tollerton was called as a Department witness on November 30, 1984 and his direct examination was completed on that date. Petitioner was granted an adjournment of cross-examination to enable Tollerton to produce personal notes and records for petitioner's inspection and use. The next scheduled hearing for cross-examination of Tollerton, January 18, 1985, was adjourned at petitioner's counsel's request. Tollerton was hospitalized by the time of the next adjourned hearing date and never recovered. Under the foregoing circumstances, the Board could reasonably conclude that the Department had complied with its obligations, under State Administrative Procedure Act § 306 (3) and its stipulation in this case, to afford petitioner an opportunity to cross-examine Tollerton, and that his subsequent unavailability for cross-examination was not attributable to the Department. Moreover, the Board's findings demonstrate that, in virtually every instance where Tollerton's testimony was relied upon, it was backed up by the testimony of other witnesses or by otherwise admissible documentary evidence.

We have considered petitioner's remaining points and find them equally unpersuasive. Accordingly, the determination should be confirmed in all respects.

MAHONEY, P. J., KANE, WEISS and HARVEY, JJ., concur.

Determination confirmed, and petition dismissed, without costs.